In Special Term—November 1854.

STORER, J. presiding.

SELLEW *vs.* CHRISFIELD & PEALE—SMEAD et al. *vs.* SAME.

The Court must infer from each fact proved, its legitimate consequence, whether it follow or not.

Where one. partner absconds, and the other disposes of a part, and is disposing of the whole partnership effects, it will be presumed that they intend to delay and hinder their creditors, so as to form good ground for attachment against the partnership property.

Where one partner avoids service of process by absconding, and the other co-partner remaining in possession of the stock of goods, is insolvent, an attachment may be laid on the partnership property.

*Semble,* that the absconding of *one* partner would be a good cause for an attachment against partnership property.

One partner may assign the whole co-partnership stock, without the presence or assent of his co-partner, if done in good faith.

*Semble,* that if such assignment was fraudulent, the creditors may reach the property by attachment.

This was a motion to dismiss an attachment.

The affiants state that Chrisfield has absconded, in fraud of his creditors, and Peale, his co-partner, is about to dispose of the partnership property, and has actually disposed of a part of it, for the same purpose.

These facts are denied.

STORER, J.

Much evidence has been adduced on both sides, and in the mass of facts before us, the most prominent are these : On the 20th of the present month, Chrisfield left the city, and has not since returned.   It is admitted he has absconded.   His conduct, before his departure, foreshadowed his determination to commit just such an act as that which is proved, and so far as this defendant is concerned, there is no difficulty in deciding the law.

It further appears, that on the morning after Chrisfield's departure, Peale, his co-defendant, ascertained that his partner had secretly disappeared, though he had imparted his intention the day before of visiting a person in the immediate vicinity of the city.   So soon as the fact was known, the creditors became uneasy, and several of them called on the said Peale to know what would probably be the result.   To some he gave one answer, and to some another.   To one he said his partner had gone to the country to collect money; to another, that he did not

know where he had gone. On the next day, the store presented a very busy appearance; unusually so. Several creditors were there, who took goods for their claims, to large amounts; and the delivery was made in a very hurried manner; so much so, as to excite curiosity, as well as suspicion. At one time, it is proved, during that day, eight or ten drays, and three or four express wagons, were at the door, to convey away the stock. So hasty was the work, that one person was noticed to cross the street at a quick pace, with a quantity of merchandise in his arms. On the succeeding day, throughout the whole morning, the same course was pursued, until the sheriff, having served the attachment now sought to be dismissed, took possession of the unsold stock about 2 P. M.

It is proved that Peale refused to pay the debt claimed to be due, by Sellew, on the ground that it was not a partnership liability; but it appears, by the testimony of the plaintiff, as well as the clerk of the defendants, that it was.

The day book, journal, and ledger of the defendants are produced. There is no account to be found of the goods sold to the creditors, on the days we have already referred to. No schedule of prices, or description of articles, is entered. No discharge, except by parole, of the partnership indebtedness, is now held by Peale.

It is further in evidence, that on the 21st day of November, Peale conveyed to Mrs. Richardson, (a married woman, and his sister-in-law,) a portion of his real estate, claiming to owe her for loaned money $2500, a portion of which had been loaned as far back as 1838. The estate conveyed was a house and lot, the house not yet completed, and worth altogether, when finished, about $6000.

Upon this the workmen held claims to the amount of
$1500 or $2000, which, it is asserted, Mrs. Richardson
assumed; but there is no evidence of the assumption, ex-
cept the statement of the grantor, and grantee.

On the 21st day of November, a deed was also made
by Peale, to his brother John Peale; and on the 23rd
day of November, another deed was executed to James
A. Peale, another brother; the consideration of both being
debts of an old date, one of which was at 8 per cent in-
terest, and on the other he states he expected to pay in-
terest, though he had not done so. These conveyances
covered all the real estate owned by Peale.

On looking into the evidence carefully, it is apparent,
that the partnership was insolvent at the time Chrisfield
absconded, and had been, in all probability, for the last
three years. It is evident that Chrisfield knew the fact,
and calculated accordingly. When Peale became a part-
ner, he purchased the interest of Ross, who was then the
principal owner, and gave him $5500 in city property;
Chrisfield having at the time no capital in the concern,
except his skill and ability as general manager. He then
owed, it is proved, $6000, and had nothing to pay the
debt; it was held by different parties, until, by the tact
of the debtor, this private liability assumed the form of a
partnership debt. Meanwhile, the stock was kept up, and
at the time the attachments were levied, about $9000
were found on hand. The resources of the firm were the
daily receipts and sales, the only increased capital added
by Peale being $1100, during the whole time the partner-
ship existed.

It is stated, however, that the books show large profits,
to an amount even larger than so small a capital would

justify; but it must be recollected, that these books were kept under Chrisfield's direction, and cannot, until thoroughly examined, corroborate the assertion that is made, that such profits were ever made; more especially, when the expenses of the establishment were to be first paid.

In addition to this, the firm paid high interest; borrowed money to large amounts, and very frequently. Some time before the departure of Chrisfield, the creditors, it appears, began to suspect his honesty, having detected him in frequent violations of the truth.

On this state of facts we are asked to set aside these attachments.

Whatever may be the statements in the affidavits, however poorly the causes of attachment are set forth, we must decide the present motion upon the whole evidence submitted to us; and if we can ascertain, from a review of all the facts, what was the intention of Peale in the sale of the partnership property, as well as his own private estate, it is our duty so to decide.

This is the rule in New York, under a Code similar to ours, and we adopt it.

In 12 *Barb.* 273, Gerrard *vs.* Tompkins, it was held that the Court must infer, from each fact proved, its legitimate consequence, whether it follow or not; whilst the most liberal construction should be allowed to the provisions of the Code, to effect the object for which so summary and efficient a remedy is given.

That was a case, where a debtor was held to have absconded, when he had merely retired to a private part of the city of New York, during the business hours of the day, long enough to evade process, and make an assign-

ment, though he returned in the evening, and went voluntarily to the officer, who had been prevented from serving the summons, and then permitted a service. He was held to have temporarily concealed himself, and the time occupied was immaterial, "whether an hour, a day, or week." The intent gave character to the act, and the act itself furnished the evidence of the intention.

After the most charitable construction of the conduct of the defendant Peale; after giving the benefit of all doubts that may be raised, to negative the existence of fraud in intention, and permitting at the same time the largest discretion to a debtor to prefer his creditor, if it is done in the usual course of business, and not recklessly, or hastily, so that it may not bear the character of a shift, or desire to hinder or delay particular creditors, we must conclude that the conduct of the defendant was not such as to rebut the clear presumption, that he preferred to save some of his creditors, at the expense of the others; that he would not have taken the course he did, were it not his object to accomplish that end. He knew there was a number of creditors, whose claims he did not admit, and was determined, if possible, to rid himself from the payment. He had taken legal advice, and was assured that he was not liable, and thus determined for himself what alone should have been the function of a legal tribunal. He placed a portion of his personal property, and all his real estate, as he thought, beyond the reach of process: This course was precisely that which a man would pursue, who wished to distinguish between his creditors, not for the purpose of paying a confidential creditor, in good faith, but to leave a certain class remediless, committing as to them practical bankruptcy, for which, in ev-

ery country where a bankrupt law exists, he would be at \
once subjected to its penalties.

Here is a debtor, not merely disposing of the partner-
ship property, in a manner pronounced by the witnesses
to be extraordinary, and surely contrary to the usual and
accustomed course of business; but granting away his pri-
vate estate to relations, who had no security, and asked
none, and whose claims were of an old date; one of the
grantees being a married woman, with whom he could not
legally contract, and the other his brother.

We cannot be asked to infer good faith as to the non-
preferred creditors in this.

We deem it to be our duty then to hold, that an at-
tachment will issue against both defendants, the one hav-
ing absconded, and the other having disposed of a part of
the partnership property, and about to dispose of the
whole; the effect of which must be to demonstrate the in-
tention to hinder, and delay, if not directly to defraud
creditors.   And when we take into consideration his con-
duct in relation to the conveyance of his entire real estate,
all doubt as to his object, we think, is removed.

A Court of Equity would have taken the entire control
of the partnership effects, on the application of the cred-
itors, so soon as the absconding of Chrisfield was known;
or the circumstances disclosed; or the fact being fully
proven, that his withdrawal seriously affected the busi-
ness, and his copartner was not competent to fill the place
in the firm that Chrisfield had occupied.

If we apply the rule that would authorize such an in-
ference, to the present motion, we have a very strong an-
alogy to sustain these attachments.

We hold also, that if there was no foundation for the

conclusion we have arrived at, that still it is clearly shown that Peale is insolvent; his real estate is gone; and the partnership property is not sufficient to pay the debts; while the large indebtedness, created by Chrisfield, is yet to be provided for, as we cannot now decide that Peale is bound to pay them. And this insolvency of Peale, coupled with the absconding of Chrisfield, is sufficient to sustain the attachments. This we regard as the true rule or principle. An insolvent resident partner, in possession of a stock of goods; and a fugitive copartner, avoiding the process of the law, must be subject to just such process as this. We can hardly conceive of a stronger case for the intercession of the Court, except where actual fraud is proved. But this has been decided in a sister court; 1 *Chandler* 48, Pratt *vs.* Pratt.

This view of the case saves us the necessity of examining fully, and deciding, a very important and interesting question, under the Code, as to the effect of the absconding or fraudulent conduct of one partner, to authorize an attachment of the partnership property.

The reason of the remedy, so peculiar, exclusive, and summary, where one joint debtor can be proceeded against, by attachment, when the other may be served by summons, would seem to warrant the conclusion, that the joint property may be reached by process against one debtor only; and the analogy afforded from the liability of all the members of a firm, for the fraudulent act of either in the course of the partnership business, indicates, that similar conduct on the part of one partner might authorize an attachment under the Code, against all. In the one case, the right is involved; in the other, the remedy merely.

*Story on Partnership,* § 109 § 166.

*Collyer* ditto, B. 3. Chap. 1, § 5, page 293—304.

15 *Mass.* 335 ; Boardman *vs.* Gore.

5 *Hare* 542 ; Blair *vs.* Bromley. (*Eng. Chy. Rep.*)

Stone *vs.* Marsh, 6 *B.* & *C.* 551 ; 1 *Metcalf* 562, Locke *vs.* Stearns ; 2 *B.* & *A.* 795, Rapp *vs.* Latham.

It is now, we believe, generally admitted by the profession, that one partner may assign the whole copartnership stock without the presence, or assent of his copartner, if done in good faith ; but should it appear that the act was fraudulent, the whole property would, without doubt, be subjected to the claim of the creditors ; and it is difficult to conceive why an attachment would not well lie, to effect that object.

As it is not necessary to the decision of this case, that the last point should be determined at this time, we forbear to do so. We intimate, however, what would be our opinion in a proper case.

The motion to dismiss these attachments must be overruled.

CALDWELL & PADDACK, TILDEN, RAIRDEN, & CURWEN for plaintiffs. COLLINS & HERRON for defendants.